OFFICE OF CONSUMERS'
COUNSEL, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Great Plains Gasification Associates, Tennessee Gas Pipeline Co., Columbia Gas Transmission Corp., Transcontinental Gas Pipe Line Corp., Natural Gas Pipeline Co. of America, Madison Gas and Electric Co., Wisconsin Power and Light Co., U. S. Department of Energy, Michigan Wisconsin Pipeline Co., General Motors Corp., Public Service Commission of New York, Intervenors.

GENERAL MOTORS CORPORATION,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Tennessee Gas Pipeline Co., Columbia Gas Transmission Corp., Transcontinental Gas Pipeline Corp., Natural Gas Pipeline Co. of America, Madison Gas and Electric Co., Wisconsin Power and Light Co., U. S. Department of Energy, Michigan Wisconsin Pipeline Co., Public Service Commission of New York, Office of Consumers' Counsel of Ohio, Gas Research Institute, Great Plains Gasification Associates, Intervenors.

The PUBLIC SERVICE COMMISSION
OF the STATE OF NEW
YORK, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Tennessee Gas Pipeline Co., Columbia Gas Transmission Corp., Transcontinental Gas Pipe Line Corp., Natural Gas Pipeline Co. of America, Madison Gas and Electric Co., Wisconsin Power and Light Co., U. S. Department of Energy, General Motors Corp., Michigan Wisconsin Pipeline Co., Office of Consumers' Counsel of Ohio, Gas Research Institute,

Great Plains Gasification Associates, Intervenors.

The STATE OF MICHIGAN, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Tennessee Gas Pipeline Co., Columbia Gas Transmission Corp., Transcontinental Gas Pipe Line Corp., Natural Gas Pipeline Co. of America, Madison Gas and Electric Co., Wisconsin Power and Light Co., U. S. Department of Energy, Michigan Wisconsin Pipeline Co., General Motors Corp., Public Service Commission of New York, Office of Consumers' of Ohio, Gas Research Institute, Great Plains Gasification Associates, Intervenors.

Nos. 80–1303, 80–1316, 80–1321
and 80–1326.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 16, 1980.
Decided Dec. 8, 1980.

Richard P. Noland, Washington, D. C., with whom Edward J. Grenier, Jr., Richard A. Oliver, Robert W. Clark, III, Washington, D. C., and Julius Jay Hollis, Detroit, Mich., were on the brief, for petitioner General Motors Corp., in No. 80–1316 and intervenor in Nos. 80–1303, 80–1321 and 80–1326.

Margaret Ann Samuels, Columbus, Ohio, for petitioner Office of Consumers' Counsel in No. 80–1303 and intervenor in Nos. 80–1316, 80–1321 and 80–1326.

R. Philip Brown, Asst. Atty. Gen., State of Mich., Lansing, Mich., with whom Frank J. Kelley, Atty. Gen. State of Mich., Lansing, Mich., was on the brief, for petitioner State of Michigan in No. 80–1326.

Richard A. Solomon, New York City, with whom Peter H. Schiff, Gen. Counsel, Public Service Commission of the State of New York, Albany, N. Y., was on the brief, for petitioner Public Service Commission of the State of New York in No. 80–1321 and intervenor in Nos. 80–1303, 80–1316 and 80–1326.

Dennis Lane, Washington, D. C., also entered an appearance for petitioner in No. 80–1321.

Jerome Nelson, Sol., Federal Energy Regulatory Com'n, Washington, D. C., with whom Robert R. Nordhaus, Gen. Counsel and A. Karen Hill, Atty., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent.

Frederic G. Berner, Jr., Washington, D. C., with whom Richard J. Flynn, Washington, D. C., for Great Plains Gasification Association, John M. Hill, Giles D. H. Snyder, Charleston, W. Va., Stephen J. Small, Leonard Sargeant, III for Columbia Gas Transmission Corp., Harold L. Talisman, Terence J. Collins for Tennessee Gas Pipeline Co., Thomas F. Ryan, Jr. and Robert G. Hardy, Washington, D. C., for Transcontinental Gas Pipe Line Corp. were on the joint brief, for intervenor Great Plains Gasification Association, et al., in Nos. 80–1303, 80–1316, 80–1321 and 80–1326.

Bruce G. Forrest, Atty., Dept. of Justice, Alice Daniel, Asst. Atty. Gen., Robert S. Greenspan, Atty., Dept. of Justice, James

K. White and Arthur S. Weissbrodt, Attys. Dept. of Energy, Washington, D. C., were on the brief for intervenor, U. S. Department of Energy in Nos. 80–1303, 80–1316, 80–1321 and 80–1326.

Christopher T. Boland and James M. Broadstone, Washington, D. C., were on the brief, for intervenor, Gas Research Institute in Nos. 80–1316, 80–1321 and 80–1326.

Edward J. Grenier, Jr., Richard P. Noland and Richard A. Oliver, Washington, D. C., were on the brief, for Amicus Curiae, Process Gas Consumers' Group, et al. in Nos. 80–1303, 80–1316, 80–1321 and 80–1326 urging reversal.

Arthur S. Kallow, Chicago, Ill., also entered an appearance for intervenor, Natural Gas Pipeline Co. of America in Nos. 80–1303, 80–1316, 80–1321 and 80–1326.

Bruce F. Kiely and Catherine C. Wakelyn, Washington, D. C., also entered appearances for intervenor, Madison Gas and Electric Co., et al. in Nos. 80–1303, 80–1316, 80–1321 and 80–1326.

Before ROBB, WALD and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Circuit Judge ROBB concurs in the result.

WALD, Circuit Judge:

Petitioners seek review of a decision[1] by the Federal Energy Regulatory Commission ("FERC") to grant a certificate of public convenience and necessity to Great Plains Gasification Associates ("Great Plains") pursuant to Section 7 of the Natural Gas Act, 15 U.S.C. § 717 et seq. The certificate was issued to facilitate the construction and operation of a coal gasification plant which Great Plains wishes to build in Mercer County, North Dakota. We hold that FERC lacked jurisdiction to issue this particular certificate and remand the case to FERC for further proceedings consistent with this opinion.

## I. THE GREAT PLAINS PROPOSAL AND FERC ACTION

Great Plains is a partnership[2] formed to construct a facility which will manufacture synthetic gas from coal (a "coal gasification plant"). The plant is designed to produce an average of 125,000 Mcf[3] of synthetic gas per day when fully operational, and is estimated to cost over $1 billion to build.[4] It will utilize both the so-called "Lurgi process"[5] and the "Menthanation process"[6] to convert lignite coal feedstock from nearby

1. Federal Energy Regulatory Commission, Opinion No. 69, Great Plains Gasification Assoc., et al., (Nov. 21, 1979) (hereinafter, "FERC Opinion No. 69").

2. The partners are Columbia Coal Gasification Corporation, an affiliate of Columbia Gas Transmission Corporation; ANR Gasification Properties Company, an affiliate of Michigan Wisconsin Pipeline Company; PGC Coal Gasification Company, an affiliate of Natural Gas Pipeline Company of America; Tenneco SNG, Inc., an affiliate of Tennessee Gas Pipeline Company, a division of Tenneco, Inc.; and Transco Coal Gas Company, an affiliate of Transcontinental Gas Pipe Line Company. The companies with whom each of the partners are affiliated are jurisdictional pipeline companies. *See generally* note 28 *infra*.

3. 1 Mcf is 1,000 cubic feet. Projected later expansion may double the plant's capacity.

4. The total installed cost of the gasification plant in 1978 dollars is estimated to be $890 million. The development of a coal mine adja-

cent to the plant is estimated to require an additional capital investment by Great Plains of $85 million. Assuming an annual rate of inflation of 7.5%, the capital costs of the gasification plant and the portion of the coal mine dedicated to Great Plains are estimated to total $1,176,165,000. This estimate assumes that the pre-operational costs to capital will be borne by ratepayers on a current basis; otherwise the capital costs are estimated to exceed $1.5 billion. FERC Opinion No. 69, at 4.

5. This process was developed by a German company to convert coal to low-Btu gas. In this process crushed coal undergoes "pressure gasification" involving reactions with oxygen and steam. This produces a synthetic raw gas which is treated to remove tar, heavy oils, and gas liquor. The treated gas is then passed through a catalytic process that modifies the composition of the gas. The Lurgi process ends with removal of other impurities and leaves a purified low-Btu gas.

6. This process converts the low-Btu gas into high-Btu pipeline quality gas. Catalytic reac-

surface mines into high-Btu,[7] pipeline quality gas. Great Plains proposes to contract with the Great Lakes Gas Transmission Company ("Great Lakes") to transport the manufactured gas through a pipeline to be constructed from the tailgate of the plant to a point on Great Lakes' existing pipeline system near Thief River Falls, Minnesota. There the synthetic gas would be commingled with natural gas and then transported through Great Lakes' facilities to a point near Crystal Falls, Michigan.[8] At Crystal Falls, Great Plains would sell equal quantities of commingled synthetic and natural gas [9] to each of five customer pipeline companies. The gas would then be delivered by those companies to consumers. FERC Opinion No. 69, at 4.

The original proposal for a coal gasification plant in Mercer County was filed in March, 1975 by Michigan Wisconsin Pipe Line Company ("Michigan Wisconsin") and ANG Coal Gasification Resources Company ("ANG"), both affiliates of American Natural Resources Company ("American Natural"). These applicants proposed a plant capable of producing 250,000 Mcf of synthetic gas per day for the purpose of alleviating a shortage of natural gas on the Michigan Wisconsin system. Later, during administrative hearings on the proposal held in 1976, the applicants scaled down the plant production capability to 125,000 Mcf during the first phase of a proposed two phase construction program. In November, 1976, after those hearings had been substantially completed, applicants requested that the Administrative Law Judge defer ruling on their proposal because federal

loan guarantees which they had counted on to provide essential support for the debt portion of the project's financing had not yet been approved by Congress. The Administrative Law Judge granted applicants' request, and on May 9 and August 8, 1977, amended applications were filed by the American Natural affiliates, joined by Peoples Gas Company ("Peoples"), in which American Natural and Peoples agreed to share both the burden of financing and the plant's output. However, the amended application continued to assume the availability of Federal loan guarantees. FERC Opinion No. 69, at 11.

Additional hearings were held on the amended application, but once again applicants declared that they wanted to substantially restructure their proposal because of inadequate financing. Mr. Arthur K. Seder, Jr., Chairman and President of American Natural, testified before the Administrative Law Judge that "[f]or the past several years our principal efforts to arrange debt financing for the project have centered around obtaining Federal loan guarantees." Joint Appendix (hereinafter "J.A.") at 26. He went on to state that "we were getting some encouragement to believe that the Administration might . . . simply go directly to Congress and ask for authority to grant loan guarantees toward [the] project." J.A. at 38–9. Now, however, it appeared to Mr. Seder that the Department of Energy ("DOE") would not do that, and other possibilities for federal loan guarantees were unpromising. According to Mr. Seder,

tors convert the carbon monoxide and hydrogen to methane. The gas is then compressed and dehydrated to meet pipeline quality specifications. *See generally* Senate Committee on Energy and Natural Resources, Synthetic Fuels from Coal: Status and Outlook of Coal Gasification and Liquefaction, 96th Cong., 1st Sess. 20 (Committee Print, June, 1979) (hereinafter "Synthetic Fuels from Coal").

7. Btu means "British thermal unit," a measure of heat. Low Btu gas generally yields 150 to 250 Btu per cubic foot; high Btu gas produces between 900 and 1000 Btu. *See* Lawn, *New*

*Alchemy for Old King Coal*, Energy Management, at 32 (Fall, 1979).

8. An application by Great Lakes to transport commingled synthetic and natural gas from Thief River Falls, Minnesota, to Crystal Falls, Michigan, and to convert and operate facilities to receive and transport such gas was denied without prejudice. *See* Opinion No. 69, at 102–03, 113.

9. This means that the natural gas component of the mixture will be equivalent in heating value (Btu) to the output of the gasification plant.

it [was] suggested by officials of the Department of Energy that if other gas pipeline companies are brought into the project and a consortium is formed, DOE would recommend the approval by FERC of tariff and financing conditions that would provide *consumer credit support* against the risks of project failure and would otherwise contribute to the financeability of the project. In light of that suggestion, American Natural and Peoples have decided to inquire whether other pipeline systems are willing to join in such a consortium . . . .

J.A. at 27 (emphasis supplied). Thus, at DOE's suggestion the ratepayer financing scheme was born,[10] and applicants were permitted by the Administrative Law Judge to restructure their proposal to include additional sponsors [11] and ratepayer financing. It was this amended application by the new Great Plains Gasification Associates that formed the basis for the FERC action now here for review.

The Great Plains application made two significant alterations in the proposals of American Natural and Peoples. First, the project would be justified before FERC not as a gas supply project, but instead as a demonstration project designed to test the technical, environmental and economic viability of a coal gasification plant.[12] Second, and more important, the consumer ratepayers of the partnership companies would shoulder the burden of critical financing costs. They would guarantee the debt investment in the project under *all* circumstances, and would guarantee the sponsors' equity investment in the project with a 15% return under most circumstances, FERC Opinion No. 69, at 60, 70. Further, they would be required to pay a surcharge during construction to cover all interest expenses on debt, financing charges, taxes,

and other carrying charges, together with the 15% return on the sponsor's equity investment during that period, *id.* at 67.

The Administrative Law Judge, agreeing with the Commission staff recommendation, rejected this financing proposal and in his Initial Decision, *supra,* n.12, held that the requested certificate of public convenience and necessity must be denied. In analyzing the financing plan the Administrative Law Judge found:

Under any view, the Mercer County project will confer no special benefits upon the ratepayers. Even if it is entirely successful, the project will not serve as a true source of supply for the ratepayers, as the sponsors acknowledge—for it will manufacture only a small volume of gas which will then have to be divided among the sponsors' pipelines. On the other hand, if the project fails, the ratepayers will receive nothing at all—other than learning along with the rest of America that we cannot rely on this technology in the future.

. . . .

There may well be a national need to get on with efforts to develop a coal gasification technology, but the costs have to be borne by America's taxpayers, not some of its ratepayers. After all, whatever benefits are to be derived from this project will be shared by the entire country, not merely some ratepayers. It would simply be inequitable to have perhaps one-third of the country pay all the costs of the project, including paying for the modest volumes of coal gas to be obtained if the project is successful, while the benefits of learning whether or not it is practicable to manufacture and market coal gas would inure to the nation as a whole.

**10.** *Cf.* FERC Opinion No. 69, at 11.

**11.** Columbia Gas Transmission Corp., Tennessee Gas Pipeline Co., and Transcontinental Gas Pipe Line Corp. were added at this stage to form the Great Plains partnership.

**12.** *See* Initial Decision of Administrative Law Judge, Great Plains Gasification Assoc., *et al.,*

Docket No. CP 78–391, at 4, 28 (June 6, 1979), J.A. 396, at 403, 427; FERC Opinion No. 69, at 25. This was done presumably because none of the five partnership companies would ever receive any substantial amount of gas from the project. *See* FERC Opinion No. 69, Holden, Commissioner, concurring in part and dissenting in part, at 1–2 & nn.1, 2.

J.A. at 427, 404. Thus the Administrative Law Judge held that the ratepayer financing arrangement failed to meet the statutory public convenience and necessity standard.

In the alternative, the Administrative Law Judge held that "[e]ven if it could be found that these ratepayers alone should bear the project costs, part of the sponsor's financing plans still does not comport with public convenience and necessity." *Id.* at 404. The Administrative Law Judge isolated three specific features of the scheme which were objectionable. First, he held there should be no automatic recovery of the sponsors' equity in the event the project should fail. Instead such recovery should await completion of hearings before FERC at which the sponsors could attempt to show that specific circumstances made it appropriate for ratepayers to reimburse them for their investment in the failed project. *Id.* at 431. Second, he held that sponsors' request for a minimum 15% guaranteed return for the entire life of the project should be denied in favor of a "fluctuating return on equity" to become effective after the first twelve months of operations. *Id.* at 432–33. Third, he rejected the sponsors' application for a pre-operational surcharge to cover the cost of debt and equity capital during construction. *Id.* at 433–35.

On November 21, 1979, FERC, by a vote of 2–1 (two Commissioners not voting), reversed the decision of its Administrative Law Judge, rejected the recommendations of its own staff,[13] approved the applicants' financing plan with minor modifications, and granted a certificate of public convenience and necessity to Great Plains authorizing the requested "sales for resale in interstate commerce."[14] Regarding the basic objection that a relatively small group of ratepayers would be financing a project whose benefits, if any, would not accrue

primarily to them, the Commission responded:

> This project will be supported by consumers of approximately one-third of the Nation's interstate gas and any burden will be small and will be justified by the benefits to those consumers. We hold this to be satisfactory for a finding that there is a sufficient sharing of costs and benefits so that, assuming the other requirements are met, the public convenience and necessity will be served by granting the requested certificates.

FERC Opinion No. 69, at 47.

FERC's belief that the project was entitled to support through this admittedly "extraordinary," "atypical" and unprecedented financing scheme, *id.* at 60, was based

> in substantial part on the determination that the public convenience and necessity requires the commercial demonstration of coal gasification. The Mercer County project will aid the public interest by providing data as to the availability of this process as a supplemental energy source. Just as certain pipelines have been certificated, at least in part, for the reason they would encourage exploration and development in new production areas, the proposal here may lead to the construction of numerous coal gas plants resulting in a significant additional amount of gas available to consumers.... [O]ur decision here reflects, not only an evaluation of the specific component elements of the project advanced by the applicants but also—and unquestionably of even wider significance—the potential importance of the project in evaluating the feasibility of converting the Nation's abundant coal reserves into pipeline quality gas.

*Id.* at 58.

FERC's determination that the commercial demonstration of coal gasification was

---

**13.** The Federal Energy Regulatory Commission Staff Brief Opposing Exceptions, J.A. at 463–74.

**14.** FERC Opinion No. 69, at 113. *See generally* text at n.28 *infra.*

in the public interest was purportedly reached in accordance with Federal Power Commission Order No. 566,[15] which set out procedures and guidelines for advance assurance of rate treatment for research, development and demonstration ["RD&D"] expenditures by jurisdictional companies. While admitting that "[t]he Commission's RD&D regulations [such as Order No. 566] envision rate filings under Section 4 of the Natural Gas Act rather than certificate applications under Section 7 as are involved here," FERC Opinion No. 69, at 48–9, see generally p. 25 infra, the Commission went on to state that "if this project falls under the RD&D rubric the case for treatment different from that accorded ordinary pipeline investments is stronger.... [A]s a minimum Order No. 566 stands for the Commission's willingness to consider permitting ratepayer support of demonstration projects to advance our knowledge about new sources of gas." Id. at 49, 53. After concluding that "different" rate treatment was appropriate for the Great Plains project pursuant to Order No. 566, FERC proceeded to approve most of the sponsors' specific financing proposals, including, inter alia, ratepayer guarantees for repayment of debt if the project should fail for any reason, id. at 63, but see note 39 infra; ratepayer guarantees for repayment of sponsors' equity investment together with a 13%

annual return (rather than 15%) even if the project should fail, so long as sponsors' investments are "prudent," id. at 65, 75; and a ratepayer surcharge during construction as requested by the applicants, see supra at p. 9. Id. at 69, 75. FERC subsequently denied all applications for rehearing[16] and petitions for review in this court followed.

## II. BACKGROUND REGARDING THE SYNTHETIC FUEL INDUSTRY

At this point we believe it useful briefly to summarize certain pertinent developments concerning the emergence of this nation's synthetic fuel industry. Synthetic fuel ("synfuel") is a catch-all term for a wide variety of non-nuclear, non-solar energy products which have the potential for serving as substitutes for petroleum or natural gas.[17]

The federal government's interest in synfuel began as far back as 1944, when a comprehensive synthetic fuel program was undertaken by the Department of the Interior under the O'Mahoney-Randolph Synthetic Liquid Fuels Act of 1944, P.L. 78–290, 58 Stat. 190 (1944). Demonstration plants were constructed and operated to produce synthetic liquid fuels from coal, oil shale, agricultural and forestry products, and other substances, in order to conserve

15. Federal Power Commission, Order No. 566, Research, Development and Demonstration; Accounting; Advance Approval of Rate Treatment (June 3, 1977) (hereinafter "Order No. 566"). The functions of the Federal Power Commission were transferred to the Secretary of Energy, or to FERC within the Department of Energy, as part of the creation of the Department of Energy, P.L. 95–91, 91 Stat. 565 (1977) (codified at 42 U.S.C. § 7101 et seq.).

The jurisdictional significance of Order No. 566 is discussed infra at n.32. Here we note only the apparent inconsistency in FERC's using the benefits of the project to the nation as a whole as a primary justification for certification, while at the same time invoking Order No. 566 which declares that "essentially all of the benefits of a proposed RD&D program should flow through to customers." Order No. 566, at 7. Also cf. n.12 supra.

16. See Federal Energy Regulatory Commission, Opinion No. 69–A, Great Plains Gasification

Assoc., et al. (Jan. 21, 1980). FERC dismissed the Office of Consumers' Counsel's ("OCC") application for rehearing on the ground that it was filed in an untimely fashion. Subsequently, FERC moved to dismiss OCC's petition for review in this court on the ground that, because OCC failed to seek rehearing before FERC within the time limits set by statute, 15 U.S.C. § 717r(a), this court lacked jurisdiction to consider the OCC petition. FERC subsequently moved to withdraw its motion to dismiss, and on October 8, 1980, the motion was withdrawn.

17. Among those synfuel technologies which are considered to be currently or imminently available for commercial use are coal gasification and liquefaction, surface oil shale retorting, and production of fuel oils and ethanol from biomass. See generally Developments, Energy Law and the Environment, 8 Ecol.L.Q. 725, 781 (1980); Synthetic Fuels from Coal, supra n.6.

and increase the oil resources of the United States.[18]

In the early 1970s Congressional interest in liquid and gaseous synthetic fuels was revitalized as American dependence upon foreign oil increased while the price of such oil began to rise dramatically. In the 93rd Congress, Senator Henry Jackson introduced the National Energy Research and Development Act of 1973, which provided for the establishment of joint federal-industrial corporations to foster commercial-scale demonstrations of coal gasification, oil shale, and coal liquefaction. This measure, later enacted as the Federal Non-Nuclear Energy Research and Development Act of 1974, P.L. 93–577, 88 Stat. 1878 (1974) ("FERDA"), authorized the Department of Energy (then the Energy Research and Development Administration) to undertake a wide range of joint government and industry energy research and development activities.

In 1977, the Senate approved an amendment to the fiscal year 1978 FERDA authorization bill providing a case-by-case procedure for Congressional approval of loan guarantees for individual synthetic fuel projects.[19] The Senate amendment was incorporated into the 1978 authorization bill and was subsequently enacted into law, P.L. 95–238, 92 Stat. 47 (1978). That law provided the Department of Energy with loan guarantee authority to complement the earlier enacted powers to provide loans, price guarantees, and purchase agreements, and to undertake government-owned contractor-operated synthetic fuel projects, FERDA, P.L. 93–577, *supra.*

As American dependence on foreign petroleum reached crisis proportions in the late 1970s, the urgency for synfuel development increased. In 1979, a report of the Senate Committee on Energy and Natural Resources declared:

> The United States faces an unprecedented threat to its national security and to its economic and political future .... Conservation alone cannot satisfy our future energy needs. The United States will need large amounts of new liquid fuel sources. Since there is no practical substitute for our present transportation system, it would not be prudent to delay now the development of *new liquid fuel* sources. Synthetic fuels have the potential for providing significant amounts of such future energy supplies but, the establishment of a synthetic fuels industry, unlike previous experiences with rubber or other critical materials, is far too large an undertaking to be implemented in a few months under emergency, embargo or war conditions. Despite increased national attention, the commercialization of synthetic fuels such as coal gasification and liquefaction, oil shale, and biomass, in the absence of a national synthetic fuels effort will continue to be plagued by uncertainty.

S.Rep.No. 96–387, 96th Cong., 1st Sess. 129–30 (1979). Federal participation in synfuel promotion was necessary, according to the Senate report, because

> [t]he private sector has not as yet been willing to invest the approximately $2 billion necessary to build a synfuel plant large enough to take advantage of the economies of scale common to such processes. This is because they feel that the various risks involved are too high. Not only are there technological, cost, and regulatory risks, but there is also uncertainty about the future level of

---

**18.** The sponsor of the bill, Senator O'Mahoney, declared at the time that

> there will be plenty of gasoline ... but only if the United States rapidly expands its program for the production of synthetic fuels. Without such a program we shall become an importer of petroleum and thus dependent on other lands and other peoples for the fuel supply we must have to maintain the com-

mercial and industrial leadership which *America now enjoys* ....

S.Rep. 96–387, 96th Cong., 1st Sess. 126 (1979).

**19.** The procedure required, *inter alia*, that for any demonstration facility costing in excess of $50,000,000, the approval of both Houses of Congress would be necessary before a loan guarantee could be granted. P.L. 95–238, 92 Stat. 47, 70 (1978).

prices set by the Oil Producing and Exporting Countries (OPEC). *Id.* at 130.

On June 30, 1980, the President signed into law the Energy Security Act, P.L. 96–294, 94 Stat. 611 (1980) (to be codified at 42 U.S.C. § 8701 *et seq.*) ("ESA"). Under the Act, a new Synthetic Fuels Corporation was created, with the responsibility to achieve a domestic production capability equivalent to at least 500,000 barrels per day of crude oil by 1987, and at least 2 million barrels per day of crude oil by 1992. ESA at § 125. As part of a multifaceted effort to foster a substantial synthetic fuel capability in the United States, Congress referred specifically to coal gasification plants as a target for federal support in both the ESA and the earlier FERDA statute. *See* P.L. 96–294 at §§ 112, 126, 127(e); P.L. 93–577 at § 6; *see generally* pp. 1149–1151 *infra.*

## III. STANDARD FOR JUDICIAL REVIEW OF FERC'S JURISDICTION

FERC's action here is reviewable pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2), and the Natural Gas Act, 15 U.S.C. § 717r(b). Section 706(2) of the Administrative Procedure Act declares that "[t]he reviewing court shall—... (2) hold unlawful and set aside agency action, findings, and conclusions found to be—... (C) in excess of statutory jurisdiction, ...." This is a specific directive for us to examine the agency's jurisdiction and investigate whether the agency's interpretation of what it may do under its enabling legislation is correct. Though there is some difference of opinion among both courts and scholars concerning the degree of deference generally to be accorded an agency's interpretation of law, *see generally* W. Gellhorn, C. Byse, P. Strauss, *Administrative Law* 297

ff. (7th ed. 1979); L. Jaffe, *Judicial Control of Administrative Action* 546 ff. (1965), there is no question that "[a]n agency may not finally decide the limits of its statutory power. That is a judicial function." *Social Security Bd. v. Nierotko*, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946). *See NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).

■ An agency's determination of its limit of authority under statute is always entitled to some degree of respect. *Cf. Pan American World Airways, Inc. v. CAB*, 392 F.2d 483, 496 (D.C.Cir.1968) (decision by agency to decline exercise of jurisdiction would be respected by the court where serious statutory and constitutional questions exist regarding the court's own jurisdiction to review such declination). However, the degree of respect to be accorded to an agency's statutory interpretation of the limit of its authority varies, depending upon such factors as the interpretation's inherent reasonableness, its consistency with prior precedent, its basis in statutory text and legislative history, and whether it is based on experience or expertise peculiarly within the agency's ken.[20] *See SEC v. Chenery Corp.*, 332 U.S. 194, 215, 67 S.Ct. 1760, 1762, 91 L.Ed. 1995 (1947) (Mr. Justice Jackson, dissenting); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

■ Here, the question of FERC's jurisdiction is a legal issue not implicating any expertise or specialized judgment which FERC possesses in other areas, for example, in applying the "just and reasonable" statutory standard to particular rate requests, or in applying the "public convenience and necessity" standard in particular certification proceedings.[21] Further, the assertion of

---

**20.** " 'Administrative construction [of a statute] is less potent than it otherwise would be where it does not rest upon matters peculiarly within the administrator's field of expertise.' " *March v. United States*, 506 F.2d 1306, 1316 (D.C.Cir. 1974), *quoting Thompson v. Clifford*, 408 F.2d 154, 167 (D.C.Cir.1968).

**21.** *Compare Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 268–70, 80 S.Ct.

1122, 1125–1126, 4 L.Ed.2d 1208 (1960) (where FPC decision was reached upon a construction of words in a contract by applying the law as any court would do, such decision did not involve its expert knowledge or judgment, and the reviewing court "was fully justified in making its own independent determination of the correct application of the governing princi-

jurisdiction by FERC to order a financing package of this sort is virtually unprecedented, as FERC itself admits, FERC Opinion No. 69, at 60. Under these circumstances this court has the preeminent responsibility to independently scrutinize and decide all jurisdictional issues. We bear in mind "the caveat that an agency may not bootstrap itself into an area in which it has no jurisdiction by ... violating its statutory mandate." *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745, 93 S.Ct. 1773, 1784, 36 L.Ed.2d 620 (1973). *See Usery v. First National Bank of Arizona*, 586 F.2d 107, 111 (9th Cir. 1978); *see generally*, Remarks by Clark Byse, Symposium on Judicial Review of Informal Rulemaking, A.B.A. Section on Administrative Law (Washington, D.C., Oct. 10, 1980).

With reference to administrative action specifically under the Natural Gas Act, the Supreme Court has stated that a finding of adequate jurisdiction is a key element of judicial review. In *Permian Basin Area Rate Cases*, 390 U.S. 747, 791, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312 (1968), it declared that the first responsibility of any reviewing court was to "determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority." *See Mobil Oil Corp. v. FPC*, 417 U.S. 283, 307–08, 94 S.Ct. 2328, 2345, 39 L.Ed.2d 97 (1974); *American Public Gas Ass'n v. FPC*, 567 F.2d 1016, 1029 (D.C.Cir. 1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978); *Consolidated Gas Supply Corp. v. FPC*, 520 F.2d 1176, 1184 (D.C.Cir.1975); *PSC v. FPC*, 511 F.2d 338, 345 (D.C.Cir.1975); *Cities Service Gas Co. v. FERC*, 627 F.2d 1027, 1030 (10th Cir. 1980); *United Gas Pipe Line Co. v. FERC*, 597 F.2d 581, 585 (5th Cir. 1979), *cert. denied*, 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1980) (all citing the *Permian*

language as establishing the scope of review in this area). With the scope of review thus delineated, we proceed to the issue of FERC's authority to issue Opinion No. 69.

## IV. FERC JURISDICTION OVER THE GREAT PLAINS PLANT

### A. What FERC Has Done in Opinion No. 69

FERC would have us characterize its Opinion No. 69 as merely an authorization for the applicant to sell at some time in the future a mixture of synthetic and natural gas to its affiliated interstate pipelines. In certificating these future sales, the Commission claims, it simply took into consideration the full cost of producing the synthetic gas. This characterization of the certification, as one merely for the future sale of commingled gas, is critical to FERC's position because in *Henry v. FPC*, 513 F.2d 395 (D.C.Cir.1975), this court held that the Commission had no jurisdiction over the production, sale or transportation of coal gas prior to its commingling with natural gas.

The *Henry* case arose as a result of three applications, filed with the Commission pursuant to § 7 of the Natural Gas Act, for certificates of public convenience and necessity. Two of the applications sought certificates to construct and operate facilities to transport synthetic gas and introduce such gas into pre-existing natural gas lines where it would then be commingled. Another application sought a certificate to construct and operate a coal gasification facility. The Commission, in Opinion No. 663, 50 FPC 651 (1973), held, *inter alia*, that it had no jurisdiction to issue certificates for the production, sale or transportation of coal gas prior to its commingling with natural gas,[22] and the *Henry* court sustained the

ples."), *and FCC v. RCA Communications, Inc.*, 346 U.S. 86, 91, 73 S.Ct. 998, 1002, 97 L.Ed. 1470 (1953) ("Since the Commission professed to dispose of [this] case merely upon its view of a principle which it derived from the statute and did not base its conclusion on matters within its own special competence, it is for us to determine what the governing principle is."),

with *PSC v. FERC*, No. 79–2182, slip op. at 13–14 (D.C.Cir., Sept. 24, 1980) (court should defer to the expert judgment of the Commission when considering its rate setting orders).

**22.** The Commission rejected the applications for certification except insofar as they dealt with "facilities for the interconnection of the

FPC's determination of no jurisdiction, 513 F.2d at 398. Because *Henry* therefore precludes any assertion of authority to issue a certificate for construction or operation of the Great Plains synfuel production facility, FERC asks this court to distinguish Opinion No. 69 from *Henry*, and see its action here merely as a full exercise of its authority to certificate future sales of commingled gas.

It is apparent that the sponsors carefully drafted their proposal to take advantage of FERC's acknowledged authority to certificate sales of commingled gas, and thereby hoped to avoid the *Henry* limitation on FERC's authority to certificate or regulate synthetic gas plants. But, in fact, Opinion No. 69 cannot be viewed simply as an authorization for the sale of commingled gas; nor can it be viewed simply as an authorization for charging rates and tariffs applicable to such gas sales which properly take account of the full cost of producing the synthetic component of a commingled natural-synthetic gas product. On the contrary, both the Great Plains application, J.A. at 359–70, and its acceptance with certain modifications by FERC in Opinion No. 69, must be viewed realistically as directed toward obtaining financing for the proposed synthetic gas facility. Opinion No. 69 thus is the midwife indispensable for the project's coming into being at all. Although Opinion No. 69's orders are appropriately couched in terms of certificates for the transportation and sale of commingled gas, they are actually far more than that; they are designed to provide the Great Plains sponsors with nothing less than "extraordinary financial guarantees:"[23] ratepayer-based guaranteed recovery of invested capital, and contemporaneous recovery of financing costs during construction, both of which these sponsors insist upon in order to proceed with the project. As FERC Commissioner Holden wrote in Opinion No. 69:

> The only reason this project is here is financing. Only by securing a structure which allows the project costs to be assigned to ratepayers can the sponsors get moving. Otherwise, it is an oddity that, in this season of increased deregulation, companies should ask us to stretch our jurisdiction and include what we would normally not cover. *This is not a gas supply project, but a financing package.... [The Commission] is being asked to undertake the role of facilitating the investment program of the participating companies.*

FERC Opinion No. 69, Holden, Commissioner, concurring in part, dissenting in part, at 2 (emphasis supplied). In short, we are dealing with an attempt by FERC to utilize its certification and rate setting powers to make possible financing for the prospective construction of a non-jurisdictional, commercial-size coal gasification plant.

Two distinct features of Opinion No. 69 convince us that ours (and Commissioner Holden's) is the proper characterization of FERC's action, and that FERC's own description of Opinion No. 69 as nothing but a certification of future sales of gas seriously misses the mark, distorting rather than clarifying what it has done. First, the facility which is the object of the ratepayer-based financing scheme bears at best a tenuous relationship to any future jurisdictional sale or shipment of gas. The hypothetical sale of commingled gas is remote in time, place, and possibly even probability of occurrence, from the focus of this order. Evidence of this is found in the order itself, where FERC refused to certify any transportation system which would connect the synthetic gas plant to the natural gas pipeline system and enable the jurisdictional sale to take place. In denying certification for a proposed transportation facility, the Commission noted, "despite all of the assurances regarding the relative certainty of the technology to be employed in the gasification process, we cannot be unaware that a possibility nevertheless exists that abandonment of the project may occur during the

artificial gas pipeline to [a] jurisdictional pipeline and to the transportation and sale of artificial gas mixed with natural gas ...." 50 FPC at 667.

**23.** FERC Opinion No. 69, at 60.

construction period." FERC Opinion No. 69, at 102–03; *see id.* at 113. Therefore, the future jurisdictional sale upon which FERC bases its authority to approve this financing package, *see infra* at pp. 27–9, may never even take place. Even if it does, the sale will occur years after the construction surcharges have gone into effect, at a location hundreds of miles from the site of this project and in a different state, and in an amount so insignificant that it will represent less than 2% of the ratepayers' gas supply.[24]

A second factor fueling our skepticism of FERC's description is that the gasification plant will actually be *regulated* during the construction and pre-operation period by the Commission pursuant to its Opinion No. 69.[25] Aside from the obvious regulatory features of setting rates of return for the sponsors and pricing provisions for the ratepayers, there are additional, substantial regulatory features in Opinion No. 69 which relate to the plant's construction and operation: (1) FERC requires the installation of a "project monitoring system" whose details are as yet uncertain, but may include "periodic reports from the sponsoring companies, on-site inspection by Commission or Department of Energy personnel, auditing of construction and operating expenses, or review of final design and plant specifications." FERC Opinion No. 69, at 109. Significantly, at oral argument FERC's counsel volunteered the information that two FERC staff people are already working full-time at the home office of the applicant "overseeing daily" the various aspects of the early construction phase.[26] (2) FERC requires that Great Plains keep its books in accordance with accounting procedures established by the Commission for the books of jurisdictional gas pipeline companies. *Id.* at 115.[27] (3) FERC retains authority to determine whether "any costs which Great Plains has incurred may not have been rea-

sonably and prudently incurred . . . ." *Id.* (4) FERC has "reserved the right to order an abandonment of the project whenever it concludes that continued construction or continued operation is no longer in the public interest." *Id.* at 106. (5) FERC requires that the sponsors secure its permission before abandoning the project *prior* to completion. (Of course after completion when gas from the plant is commingled, FERC would have such authority under § 7(b).) *Id.* at 65. (6) FERC requires that no sponsoring company may withdraw its support from the project without prior FERC approval. *Id.* at 114.

Thus Opinion No. 69 mandates a major role for FERC not only in arranging financing for a non-jurisdictional facility, but also in regulating its construction and operation (or non-operation). In fact, we find it difficult to see how FERC can at the same time disclaim authority to regulate the Great Plains facility, and also issue Opinion No. 69 which has all the characteristics of regulation except the name. This court is well aware of the beneficent motive—the protection of ratepayers—which prompted FERC to insist upon including regulatory features as a condition of approving the sponsor's financing scheme. But however beneficent the regulation, it is regulation nonetheless. In fact, the very necessity for ongoing FERC regulation and oversight of the plant involved in this particular financing scheme puts in stark relief the question now before this court of whether FERC has jurisdiction under the Natural Gas Act to order this particular ratepayer-based financing package for the construction of a commercial-size coal gasification plant.

*B. The Limits of FERC Jurisdiction Over Synthetic Gas Under the Natural Gas Act*

FERC asserts jurisdiction for its action under the Natural Gas Act; yet that stat-

---

**24.** *See* FERC Opinion No. 69, Holden, Commissioner, concurring in part and dissenting in part, at 1 n.1. The applicants themselves admitted that "none of the sponsors will receive any substantial amount of gas from the initial project." *Id.* at n.2.

**25.** At oral argument, FERC's counsel admitted that this was so.

**26.** *Id.*

**27.** *See generally* n.28 *infra* and accompanying text.

ute is devoid of any mention of authority to arrange financing for, or to regulate, coal gasification plants. We must therefore turn to an analysis of the text and legislative history of the Act to discern the general limits of FERC's jurisdiction regarding synthetic gas.

Section 2 of the Act defines "natural gas" as either "natural gas unmixed, or any mixture of natural and artificial gas," and defines "natural-gas company" as a person or corporation "engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."[28] 15 U.S.C. § 717a. It is only over such gas and such companies that FERC has jurisdiction pursuant to the Act. Section 7 of the Act provides the Commission with authority to issue certificates of public convenience and necessity to natural gas companies who wish to construct or extend facilities to be used in the sale or transportation of natural gas, 15 U.S.C. § 717f(c)(1)(A), while Section 4 of the Act delegates to the Commission authority to regulate "all rates and charges" relating to "transportation or sale of natural gas subject to the jurisdiction of the Commission...." 15 U.S.C. § 717c. The plain meaning of these sections gives no indication that Congress intended FERC to utilize either its Section 4 or Section 7 powers as it has in Opinion No. 69.[29]

The legislative history of the Act provides evidence of Congressional intent not to vest any authority with the Commission over unmixed synthetic gas. In hearings on a precursor of the bill that became the Natural Gas Act a proposal was made by a witness to delete the word "natural" throughout the bill and define "gas" as "either natural gas or artificial gas or any mixture of natural and artificial gas." Subcommittee of the House Committee on Interstate and Foreign Commerce, Hearings on H.R. 11662, 74th Cong., 2d Sess. 92, 98 (1936). The proponents of the suggestion were concerned that (1) pipeline companies would attempt to avoid FPC jurisdiction by injecting a small amount of artificial gas into their natural gas line, and that (2) artificial gas unmixed with natural gas would escape the Commission's jurisdiction altogether. In the next session of Congress, an amendment was added to the natural gas regulation bill responding only to the former of these concerns, namely, that regulation not be evaded by mixing artificial with natural gas; the amendment made no attempt to regulate unmixed artificial gas. Subsequently, in Senate debates on the proposed act, a colloquy between Senators Connally and Wheeler made explicit the understanding that the act would not reach artificial gas. 81 Cong.Rec. 9315–16 (1937).

In our prior review of the legislative history of the Natural Gas Act, *Henry v. FPC*, 513 F.2d 395 (D.C.Cir.1975), this court concluded that Congress had made a deliberate decision not to extend Commission jurisdiction to such gas:

---

**28.** We think it significant that FERC's Staff Brief opposing the grant of a certificate to Great Plains notes that the company does not yet qualify as a jurisdictional company under the statute. J.A. at 468 n.6. If the project fails to produce any gas, or if the product manufactured at the plant is not sold *after* being commingled, then Great Plains would never qualify as a jurisdictional company and would be completely beyond FERC's jurisdiction. *Cf.* FPC Opinion No. 663, 50 FPC 651, 667 (1973) (in rejecting an application for certification of a coal gasification plant, Commission found, *inter alia*, that applicants "are not and will not become 'natural gas companies' pursuant to the Natural Gas Act upon the construction and operation of the ... coal gasification facilities.").

**29.** Regarding the scope of Commission authority under the Act, the Supreme Court has stated,

> three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.

*Panhandle Eastern Pipe Line Co. v. PSC*, 332 U.S. 507, 516, 68 S.Ct. 190, 194, 92 L.Ed. 128 (1947).

[The] legislative history gives fair indication that Congress had been made aware of the potential of interstate transmission of artificial gas, but had decided to defer that matter for resolution when the technical future might become an economic reality, rather than deal with it hypothetically. There was nothing to indicate that the Act was intended to become applicable automatically, without further Congressional determination, some time in the future—as it happens, almost 40 years later—when large-scale interstate transportation of manufactured gas should become both a technical and economic reality.

*Id.* at 401.[30] We agree with this analysis, and conclude that Congress did not intend to vest in the Commission any direct authority over the manufacture of unmixed synthetic gas.

### C. FERC's Jurisdictional Argument

FERC's argument that it has jurisdiction to order this ratepayer financing scheme, along with its regulatory features, is based on two premises. First, the Commission contends that although it

has no jurisdiction under the Natural Gas Act over the project facilities in North Dakota, ... [o]nce the output of the gasification plant has been commingled with natural gas, however, the Commission would possess full and complete jurisdiction to regulate any *subsequent* transportation of the gas in interstate commerce and its sale in interstate commerce for resale for ultimate public consumption .... The Commission's involvement arises by virtue of several Section 7 applications for certificates to transport commingled coal gas and natural gas and to make sales thereof for resale to the Customer Pipeline Companies.

Opinion No. 69, at 12 (emphasis supplied). This assertion of jurisdiction, however, proves too little. No one in this litigation has questioned FERC's authority to assert full regulatory authority—including the power of rate and tariff setting—over the transportation and sale of Great Plains synthetic gas *subsequent* to its creation and commingling with natural gas. FERC goes on to assert, however, that

the Commission's jurisdiction over the transportation and sale for resale of the commingled gas "gives it a *corollary authority and responsibility to look into 'all factors bearing on the public interest'*" .... *Henry v. FPC*, 513 F.2d at p. 405.

*Id.* (emphasis partially supplied). FERC would have us treat the construction and financing of the Great Plains plant as "factors" which the Commission may "look into" when it considers certificating sales of commingled gas from the plant. This "corollary authority" claim, relying on this court's opinion in *Henry*, warrants our close scrutiny. The issue is whether FERC has any so-called "corollary authority" to use its rate setting and certification tools for the purpose of arranging financing for, and regulating the construction of, commercial-size coal gasification plants.

In *Henry* we stated that, when considering certification for *jurisdictional facilities*, FERC has corollary authority to "consider ... '*all* factors bearing on the public interest.'"[31] The "all factors" language was used to describe the breadth of considerations which the Commission may take into account when "reviewing applications for certification under § 7 for, say, tap and valve facilities to introduce gas from coal

---

**30.** The parties have not argued, and we do not discuss, the contention made by petitioners and rejected by this court in *Henry* that the Natural Gas Act's jurisdictional scope should expand to take account of subsequent technological or economic development. 513 F.2d at 401–02.

**31.** 513 F.2d 395, 403 & n.23, 405. The court quoted *FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 8, 81 S.Ct. 435, 439, 5 L.Ed.2d 377 (1961), where the Supreme Court held that

the Commission's power under Section 7 to consider the public interest when deciding whether to issue a certificate for jurisdictional facilities extends generally to all factors bearing on the public interest, and specifically extends to permit FERC to look into matters excluded from the Commission's direct regulatory jurisdiction. This is, of course, not inconsistent with our holding in this case. *See* text immediately *infra.*

into natural gas pipelines," *i. e.*, for facilities over which Commission jurisdiction is unquestioned. 513 F.2d at 403. Absent those jurisdictional facilities or acts, the court in no way suggested that any "corollary authority" would exist at all. In this case, by contrast, the very existence of a relevant jurisdictional act upon which to predicate the "corollary authority" is in doubt. *See* pp. 1143–1144 *supra.* Furthermore, even assuming *arguendo* that a relevant jurisdictional act exists in this case, then the "corollary authority" spoken of in *Henry* would permit FERC simply to "*consider*" all factors in reaching its decision, not to *establish and regulate the "factors" themselves.* 513 F.2d at 403.

■ But there is a second answer to FERC's "corollary authority" argument in this case. Any such authority to consider all factors bearing on the "public interest" must take into account what the "public interest" means in the context of the Natural Gas Act. FERC's authority to consider all factors bearing on the public interest when issuing certificates means authority to look into those factors which reasonably relate to the purposes for which FERC was given certification authority. It does not imply authority to issue orders regarding any circumstance in which FERC's regulatory tools might be useful. In carrying out its statutory certification task FERC must recognize that "a *need* for federal regulation does not establish FPC jurisdiction that Congress has not granted." *FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 635–36, 92 S.Ct. 1827, 1836, 32 L.Ed.2d 369 (1972) (original emphasis).

A similar issue was presented to the Supreme Court in *NAACP v. FPC,* 425 U.S. 662, 664–65, 96 S.Ct. 1806, 1808–1809, 48 L.Ed.2d 284 (1976), which concerned the Commission's authority to prohibit discriminatory employment practices on the part of its regulatees. Regarding petitioners' assertion that references in the Natural Gas Act to the Commission's authority to regulate in the "public interest" implied authority to prohibit racial discrimination, the Court declared:

This Court's cases have consistently held that the use of the words "public interest" in a regulatory statute is not a broad license to promote the general public welfare. Rather, the words take meaning from the purposes of the regulatory legislation.

. . . .

Thus, in order to give content and meaning to the words "public interest" as used in the Power and Gas Acts, *it is necessary to look to the purposes for which the Acts were adopted.* In the case of the Power and Gas Acts it is clear that the principal purpose of those Acts was to encourage the orderly development of plentiful supplies of electricity and natural gas at reasonable prices. While there are undoubtedly other subsidiary purposes contained in these Acts, the parties point to nothing in the Acts or their legislative histories to indicate that the elimination of employment discrimination was one of the purposes that Congress had in mind when it enacted this legislation.

*Id.* at 669–70, 96 S.Ct. at 1811. (emphasis supplied). *See also Henry, supra,* 513 F.2d at 402; *Mobil Oil Corp. v. FPC,* 463 F.2d 256, 263 (D.C.Cir.1971), *cert. denied,* 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972).

■ Our own review, Section B *supra,* of the purposes reasonably attributable to Congress in authorizing FERC's certification and rate setting powers reveals that it did not intend to vest FERC with those powers for the purpose of regulating and arranging financing for facilities, like Great Plains, devoted exclusively to manufacturing synthetic gas. We therefore hold that Opinion No. 69 exceeded the Commission's statutory authority because it attempted to create a ratepayer-based financing package for the construction of a commercial-size coal gasification plant despite the fact that its rate setting and certificating powers were not granted to it for that purpose; and because it purported to regulate the construction and operation of such plant despite the fact that FERC has no regula-

tory jurisdiction over any aspect of synthetic gas development prior to its commingling with natural gas.

 Nothing in this holding denies FERC any authority it may have to consider the costs of production of synthetic gas in the course of considering jurisdictional sales rate filings and petitions under Section 4 of the Natural Gas Act, 15 U.S.C.

§ 717c, or to give advance notification that it will do so pursuant to its Order No. 566. However, FERC may not overstep the limits of its jurisdiction by claiming that Order No. 566—or any cases purportedly decided under it—can serve as authority for charging ratepayers for the construction of non-jurisdictional facilities *before* those facilities participate in activities properly regulated by the Commission.[32] Nor may FERC

**32.** The Commission has suggested that this is not so, that Order No. 566 does indeed provide a new rubric under which it can do now what it could not do before in the *Henry* case. Counsel for FERC at oral argument; *see also* FERC Opinion No. 69–A, at 10, J.A. at 681. And there are two instances in which the Commission has already invoked its RD&D regulations to approve charging ratepayers for synfuel projects before those projects produce any gas. These projects were relatively small and thus the ratepayer charges were apparently uncontested. *See United Gas Pipe Line Co., FERC* Docket No. RP77–138 (Sept. 5, 1978) (Commission, relying on Order No. 566, provided advance assurance that petitioner in rate proceeding could recover $12.7 million in RD&D costs to be incurred on a "biomass" synthetic gas project); *and cf.* FERC Opinion No. 14, Northern Natural Gas Co. (May 10, 1978) (Commission, expressly disclaiming applicability of its Order No. 566, gives approval in rate proceeding to rate treatment for applicant's $160,530 expenses to be incurred on a "coal slagging gasifier" project).

As our previous discussion has indicated, text accompanying n.15, *supra*, Order No. 566 sets out procedures and guidelines for advance assurance of rate treatment for RD&D expenditures by jurisdictional companies. It provides that certain RD&D expenditures may be included as "costs" and made recoverable from natural gas ratepayers. The Order speaks variously of "full scale demonstration facilities" and an "experimental coal gasification plant" as examples of the kind of RD&D envisioned as qualifying under its terms. Order No. 566 at 1, 37, 38 (codified in 18 C.F.R., Part 201, definition 28B). However, it also states that RD&D expenditures qualify if they are for "nonconventional pipeline gas supplies that rely on technology that has not been verified previously to be feasible," *id.* at 38, or "implementation or development of new and/or existing concepts until technically feasible and commercially feasible operations are verified." *Id.* at 37.

Because it was unclear whether the Great Plains project qualified under Order No. 566, the participants in the proceedings below spent much of their energies debating that issue. While the Administrative Law Judge and the FERC Staff believed, for different reasons, that the Order was not relevant to the Great Plains

application, the Commission determined that under Order No. 566

RD&D treatment will be accorded not only to facilities that test the technological soundness of the engineering concepts embodied in the facility but also to the economics of commercial-size plants. That is, it is not only whether the technology "works" in an engineering sense but also whether it is commercially viable as a potential source of supply.

FERC Opinion No. 69, at 52. The Commission then held that Great Plains would provide valuable data: (1) demonstrating the costs of construction and operation of the plant in relation to efficiency of operation; (2) demonstrating the impact of government regulation on coal gas commercialization; and (3) demonstrating the effect of coal gasification on the environment. *Id.* at 25–34.

We agree with the Commission that the Order is relevant in determining whether a proposed RD&D venture satisfies the public convenience and necessity under Section 7. Certainly it provides valid guidance in specifying under what circumstances advance assurance of rate treatment should be provided for RD&D projects brought before the Commission in Section 4 proceedings. Further, we recognize that despite the Commission's general practice of charging gas customers only for the costs of providing current service and deferring costs of investment for future service until that service begins, *see Tennessee Gas Pipeline Co. v. FERC*, 606 F.2d 1094, 1109 (D.C.Cir.1979), *cert. denied*, 445 U.S. 920, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1980), there may be situations where the Commission will have discretion to permit not only advance *assurance* of rate treatment, but also the charging to current ratepayers of expenditures incurred by a jurisdictional company on its RD&D experiment even before the experiment bears fruit, so long as FERC's jurisdiction to include the costs of the experiment does not depend solely on the contingency that the experiment bears fruit and contributes to the flow of mixed gas, as is the case with the Great Plains project. For example, expenditures for an RD&D project directly concerning the transportation, transfer, or storage of natural or commingled gas, or related to increasing the supply of unmixed natural gas, might in appropriate circumstances be recoverable from

use its Section 7 authority to order a financing package such as the one involved here, which imposes financing surcharges and debt guarantees upon natural gas pipeline customers for the construction of facilities which, it is hoped, will some day in the future produce synthetic gas.

### D. FERC's Action as it Relates to the Emerging Legislative Framework Regarding Synfuels

We believe our holding that the Natural Gas Act does not vest FERC with authority to promote commercial coal gasification plants is consistent with recent Congressional activity in the natural and synthetic gas fields. Furthermore, viewing Opinion No. 69 in conjunction with this recent legislative activity, we are convinced that FERC improperly ignored recent Congressional action directly affecting the financing of the Great Plains project.

1. A review of the legislative history in the energy area subsequent to enactment of

the Natural Gas Act shows that Congress repeatedly has declined to extend FERC's jurisdiction to include synthetic gas. In 1973–74 two bills were introduced in Congress which would have extended Commission jurisdiction to unmixed synthetic gas. S. 3861, 93d Cong., 2d Sess., 120 Cong.Rec., 25925 (1974); *see also* S. 2506, § 105, 93d Cong., 1st Sess., 119 Cong.Rec. 32163 (1973). Neither bill was passed. Additionally, during Congressional consideration of various bills which ultimately became the Natural Gas Policy Act of 1978, Congress specifically disclaimed any intention to include unmixed synthetic gas in its definition of natural gas over which FERC would have jurisdiction. "The definition of natural gas is identical to the definition of natural gas provided in the Natural Gas Act. It is not intended to extend the provisions of the Act to facilities for the production of synthetic natural gas. . . ." S.Rep.No.95–1126, 95th Cong., 2d Sess. at 69 (1978) (Conference Report).

current ratepayers, since such a project would be jurisdictional from its very inception. *Cf. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 316–20, 94 S.Ct. 2328, 2349–2351, 41 L.Ed.2d 72 (1974); *American Public Gas Ass'n v. FPC*, 567 F.2d 1016, 1059 (D.C.Cir.1977); *PSC v. FPC*, 467 F.2d 361 (D.C.Cir.1972) (cases not involving RD&D or Order No. 566, but recognizing Commission authority to allow current producer rates to recover funds invested for *future development of natural gas supplies*).

All this notwithstanding, however, Order No. 566 simply does not sanction what was done in this case. Order No. 566 discusses advance assurance of rate treatment, not rate treatment in advance of jurisdiction. *See* Order No. 566, at 1, 5, 11, 12, 14; 18 C.F.R. § 154.38(d); *see also* FPC Advanced Approval of Rate Treatment for Research and Development, Notice of Proposed Rulemaking [proposed Order No. 566], 41 Fed.Reg. 25,914 (1976). In fact throughout this case Order No. 566 was relied upon by the applicants and by FERC not primarily for help on the jurisdictional question, but rather to help resolve an entirely different statutory issue: whether the proposed construction of a coal gasification plant was consistent with the public convenience and necessity standard found in Section 7. It was felt that Order No. 566 might serve as evidence of FERC's belief that such plants were beneficial, and that certification was therefore proper. Order No. 566 was relevant only as a possible "basis" for the "[t]hreshold [p]ublic [c]onvenience and [n]ecessity [d]etermination" which

FERC was required by Section 7 to make. FERC Opinion No. 69, at 48.

The final and most important point to be made regarding Order No. 566, however, is that regardless of how it was used or construed until this point, and regardless of its original meaning, it is axiomatic that no order or regulation issued by an administrative agency can confer on it any greater authority than it has under statute. *National Association of Regulatory Utility Commissioners v. FCC*, 533 F.2d 601, 617 (D.C.Cir.1976) (" 'wide latitude' in the exercise of delegated powers is not the equivalent of untrammelled freedom to regulate activities over which the statute fails to confer . . . Commission authority."). *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213–14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976); *Dixon v. United States*, 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223 (1965); *Stark v. Wickard*, 321 U.S. 288, 309–10 (1944); *Manhattan General Equipment Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 134 (1936); *International Railway Co. v. Davidson*, 257 U.S. 506, 514, 42 S.Ct. 179, 182, 66 L.Ed. 341 (1922); *Real v. Simon*, 510 F.2d 557, 564 (5th Cir. 1975) ("There can be no doubt that the authority of an administrative agency to promulgate regulations is limited by the statute authorizing the regulations."). It is, therefore, only to the relevant statute that we may look to find the requisite jurisdiction in this case.

2. Congress has specifically authorized a different governmental entity—the Synthetic Fuels Corporation—to provide governmental support for risky synfuel projects, including coal gasification plants. By comparison, FERC's certification and rate setting tools seem inappropriate and inadequate for that task. The Synthetic Fuels Corporation has been given explicit authority to provide various types of financial assistance to private synthetic fuel projects. ESA[33] at § 131. Under the first phase of its mandate, through June 30, 1984, the Corporation is authorized to commit up to $20 billion, subject to specific appropriations. ESA at §§ 151(a), 152(a), 195(a). After June 30, 1984, an additional $68 billion may be appropriated upon Congressional approval of the Corporation's overall strategy to achieve the established production goals. ESA at § 126(b), (c). In addition, the Act provides interim authority to provide financial assistance of up to $3 billion for immediate commitment to synthetic fuel projects. ESA at § 105(a), amending the Defense Production Act of 1950, § 711(a)(2), 50 U.S.C.App. § 2161(a).[34] The Act also specifically authorizes the Department of Energy to make a solicitation, thirty days after enactment, for commercial scale high-Btu coal gasification plants. ESA at § 127(e).

However, whether coal gasification will eventually prove to be the most advantageous synfuel option from among the variety of those now on the horizon is acknowledged to be unclear. *See generally* S.Rep. 96–387, *supra*, at 134–35 (varying estimates on likely projected output from coal gasification plants); Synthetic Fuels from Coal, *supra* note 6, *passim*. Despite many sanguine assessments as to its potential, there are those who urge either slow, selective development of demonstration coal gasification plants, or none at all. *See, e. g.,* Ford Foundation, *Energy: The Next Twenty Years* 53, 546, 559, 579 (1979) ("[T]here is no economic justification for pushing ahead with large-scale commercial coal-to-pipeline gas projects at this time." *Id.* at 53. "Little urgency attaches to deploying a high-Btu gasification plant." *Id.* at 579.); Allain, *Environmental Implications of a Synthetic Fuel Industry*, 4 Harv.Environ.L.Rev. 391, 402, 412 (1980).

In light of the many uncertainties and options in this area, Congress wisely delegated responsibility to the Synthetic Fuels Corporation to develop a "comprehensive strategy" to achieve the nation's synthetic fuel production goals. ESA at § 126(b). As part of the comprehensive strategy, Congress directed the corporation to consider "all practicable means for the commercial production of synthetic fuel, employing the widest diversity of feasible technologies." In awarding financial assistance, the corporation must consider

> the diversity of technologies (including differing processes, methods, and techniques); ... the potential cost per barrel or unit production of synthetic fuel from the proposed synthetic fuel project; ... the overall production potential of the technology, considering the potential for replication, the extent of the resource and its geographic distribution, and the potential end use; and ... the potential of the technology for complying with applicable regulatory requirements.

*Id.* at § 131(b)(3). Congress provided the corporation with a variety of financing tools, including price guarantees, purchase agreements, loan guarantees, loans, and joint ventures, and delineated both an order of preference for using the tools as well as factors to be considered in applying them to particular projects. *Id.* at § 131(b)(2).

Thus, Congress carefully crafted a special means for providing federal financial assistance for synfuel development. The Congressional plan for developing the nation's synfuel capability is an integrated, comprehensive one, delegating specific authority to the Synthetic Fuels Corporation to take

---

**33.** *See* p. 1141 *supra*.

**34.** The funding for this interim authority, as well as for the Energy Security Act as a whole, was provided for in a fiscal year 1980 Supplemental Appropriations Bill, P.L.No.96–304, 94 Stat. 857, at 880–81 (1980).

into account both the various synfuel options as well as the various financial tools available for synfuel promotion, and to accommodate both within a national synfuel production policy.

By way of contrast, however, FERC was never given the job of developing a "comprehensive strategy" for developing the nation's synfuel industry. It possesses no expertise in making determinations regarding the relative merits of different synfuel processes, methods or technologies. Nor can it fairly and freely evaluate the various financing strategies available in theory for particular synfuel plants and select those best suited for each project. Its statutory authority in this area is limited to certification and rate setting on the basis of applications presented to it. In rejecting loan guarantees as an alternative financing option in this case, for example, FERC stated that it was an "academic" matter "because we do not have before us a proposal involving all taxpayers . . . and that option is not in our power to order." Opinion No. 69, at 45.[35]

Quite possibly because its options were thus limited, FERC approved financing arrangements which, whether or not they violated the public convenience and necessity standard as the Administrative Law Judge found,[36] were certainly not ordered with the interests of ratepayers foremost in mind,[37] but rather with an eye toward keeping the Great Plains project on track. The construction surcharge and the treatment of applicants' investment tax credit stand out as particularly questionable provisions of the approved scheme in terms of ratepayers' interests. By utilizing its statutory tools for a non-statutory purpose, FERC very likely was distracted from its primary statutory duty to protect the interests of ratepayers. *See Atlantic Refining Co. v. Public Service Commission*, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944) ("The primary aim of [the Natural Gas Act] was to protect consumers against exploitation at the hands of natural gas companies."); *Henry v. FPC, supra*, 513 F.2d at 403.

3. Opinion No. 69 and its companion Opinion No. 69–A improperly ignored contemporaneous Congressional action directly affecting the financing of the Great Plains facility. FERC's action, when viewed in light of this Congressional activity, seems to have been prompted at least in part by an attitude that because it felt Congress had not acted speedily, it would take up the slack. *See* Opinion No. 69, Holden, Commissioner, concurring in part and dissenting in part, at 6 ("The constitutional regime does not permit us to say 'Congress hasn't done it. We're going to do it.' "). *Cf.* Opinion No. 69, at 43, 45 (majority acknowledges that it "may be correct

---

**35.** The Commission did order the sponsors to seek federal financing and to revise their financing structure "if and when any [federal] financial assistance becomes available." FERC Opinion No. 69, at 45; *see also* FERC Opinion No. 69–A, at 13, J.A. at 684.

**36.** *See* pp. 1137–1138 *supra*.

**37.** This court has carefully reviewed the many arguments made by petitioners and amicus in this case which allege that in promulgating Opinion No. 69 FERC abused its discretion and acted arbitrarily and capriciously, denigrating the interests of consumers which should be its primary concern.

The Office of Consumers' Counsel of Ohio attacked the reasonableness of the surcharge as well as the finding that Great Plains qualified as an RD&D project. General Motors made the claim that FERC had failed to consider alternative financing schemes which might spread the burdens more fairly, and also asserted that the imposition of a surcharge during construction was an abuse of discretion. The submissions by the State of Michigan and amicus, The Process Gas Consumers Group and The American Iron and Steel Institute, contained similar arguments. The Public Service Commission of New York State argued that FERC improperly failed to consider available methods for spreading the costs of the Great Plains project to customers of pipelines other than the project's sponsors. It also claimed that FERC failed to take the necessary and available steps to ensure that unnecessary expenditures by the applicants would not end up being foisted upon the ratepayers. In light of our holding in this case, we deem it unnecessary to address these claims further.

... that ... the costs would best be shared by [the taxpayers]," but finds evidence indicating that it might take two years to obtain such financing from Congress). It is not for an administrative agency, however, to preempt Congressional action or to "fill in" where it believes some federal action is needed. It goes without saying that appropriate respect for legislative authority requires regulatory agencies to refrain from the temptation to stretch their jurisdiction to decide questions of competing public priorities whose resolution properly lies with Congress. *Cf. American Ship Building Co. v. NLRB*, 380 U.S. 300, 317–18, 85 S.Ct. 955, 966–967, 13 L.Ed.2d 855 (1965) (Court rejected the role assumed by the Board to assess the relative economic power of adversaries in the collective bargaining process, warning against "the unauthorized assumption by an agency of major policy decisions properly made by Congress.")

Before, during, and after the Commission's issuance of Opinion No. 69, Congressional attention was specifically focused on the degree and nature of federal financial support for synfuels. Just three weeks before Opinion No. 69 was handed down, the House of Representatives held hearings on the Great Plains gasification project, and was told by Deputy Undersecretary of Energy Robert Hanfling that "[w]e intend, hopefully through the Energy Security Corporation, which would be the proper vehicle in the future, for loan guarantees ... to be provided to the project." *Oversight: Great Plains Gasification, Hearing Before the Subcommittee on Energy Development and Applications of the Committee on Science and Technology*, 96th Cong., 1st Sess. 23 (Nov. 2, 1979). Another witness, Mr. Arthur R. Seder, Jr., Chairman and President of American Natural Resources Company, told the Committee that "each of the bills [currently under consideration] could be applied to the Great Plains Project because they carry one concept in common. Each offers financial support through two devices: price supports and loan guarantees." *Id.* at 64. In fact, the Committee was in-

formed by Mr. Seder that although FERC was then considering approval of "consumer backstopping" for the project, the Commission's draft conclusions (not yet issued) would provide for "shifting the risk of backstopping the debt to the public at large in the event Congress makes loan guarantees available." *Id.* at 85. Thus Congress was clearly aware of the role which loan guarantees might play in the financing of Great Plains, and was actively considering such financing for the project immediately prior to FERC's action.

One week after the above testimony was heard, Congress, on November 9, 1979, enacted and sent to the President for signature the first appropriations under FERDA,[38] P.L. 96–126, 93 Stat. 954, at 970–71 (1979). The President signed the bill into law on November 27, 1979. Title 2 of the statute permitted the Department of Energy to make loan guarantees of up to $1.5 billion under FERDA without any requirement for prior Congressional approval for facilities costing in excess of $50 million as otherwise would have been required by the FERDA statute. In addition, the conference report specifically directed that $22 million in additional funds should be made available to the Great Plains project "for preliminary work on a commercial coal gasification facility." H.Rep.No.96–604, 96th Cong., 1st Sess. 28–29 (1979). Although the appropriations bill was passed two weeks prior to the issuance of Opinion No. 69 by FERC on November 21, the Commission failed even to mention it. And while the appropriations Act was signed by the President on November 27, almost two months before the Commission issued its January 21, 1980 decision on rehearing, Opinion No. 69–A, the Commission again made no reference to it. This sequence of events convinces us that FERC made no effort to accommodate its action regarding Great Plains with what it knew was imminent—if not actual—Congressional action regarding the financing of synfuels generally, and Great Plains specifically.

---

**38.** P.L. 93–577, 88 Stat. 1878 (1974); *see* p. 1140 *supra*.

In sum, a review of recent Congressional activity concerning synfuels supports our conclusion that the Commission acted without proper authority in ordering Opinion No. 69. Congress has repeatedly declined to permit any extension of FERC authority into the synthetic gas area; on the other hand, it has specifically authorized a different governmental unit to undertake the tasks which FERC sought to perform through questionable use of its regulatory tools. In addition, FERC improperly ignored contemporaneous Congressional activity in its attempt to "fill in" where it believed some federal financial help was needed.

## V. CONCLUSION

This court fully understands the urgency which underlies our country's strivings to achieve energy self-sufficiency, and we recognize also that promotion of coal gasification may serve that goal. But despite the stress of the energy crisis, federal involvement in synfuel promotion can only proceed pursuant to legal authority conferred by statute. Because FERC in this case acted without statutory authority, its order is set aside and the case remanded to the Commission for further proceedings—if any are necessary—consistent with this opinion.[39]

*So ordered.*

---

**39.** This court was informed by intervenor Great Plains Gasification Associates in a motion filed November 20, 1980, that the Department of Energy issued a conditional loan guarantee commitment of up to $1.5 billion for the Great Plains project on November 19, 1980. Intervenor asserts in that motion that because of this new loan guarantee commitment it will be able to finance the project without any requirement for consumer repayment of debt in the event of the project's abandonment.

We recognize, however, that the terms of this new DOE commitment assumed that the financing scheme approved by FERC in Opinion No. 69 would form the basis of the project's financing. Our holding today invalidates that assumption, and further proceedings by FERC to revise its tariff orders may therefore be needed to take account of both the new loan commitment and this court's decision.