PUBLIC UTILITIES COMMISSION OF
the STATE OF COLORADO,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Gas Research Institute, Northern Distributor Group, American Gas Association, Interstate Natural Gas Association of America, Intervenors.

No. 80–1117.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 2, 1981.

Decided Aug. 24, 1981.

Eugene C. Cavaliere, Asst. Atty. Gen., State of Colo., Denver, Colo., for petitioner.

A. Karen Hill, Atty., Federal Regulatory Commission, Washington, D. C., with whom Robert R. Nordhaus, Gen. Counsel and Jerome Nelson, Sol., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent. Rhodell G. Fields, Atty., Federal Energy Regulatory Commission, Washington, D. C., also entered an appearance for respondent.

Christopher T. Boland, Washington, D. C., with whom James M. Broadstone, Washington, D. C., was on the brief, for intervenor, Gas Research Institute.

David J. Muchow, Arlington, Va., and John A. Myler, Washington, D. C., were on the brief, for intervenor, American Gas Association.

Peter H. Schiff, Gen. Counsel, Public Service Commission of the State of New York, Albany, N. Y., Richard A. Solomon, Washington, D. C., were on the brief, for amicus curiae Public Service Commission of the State of New York urging affirmance.

George C. Mastor, Minneapolis, Minn., and Ned Willis, Perry, Iowa, entered appearances for intervenors, Northern Distributors Group.

Lawrence V. Robertson, Jr., Washington, D. C., entered an appearance for intervenor Interstate Natural Gas Association of America.

Before MIKVA and EDWARDS, Circuit Judges, and VAN PELT,* Senior District Judge for the District of Nebraska.

Opinion for the court filed by Senior District Judge VAN PELT.

VAN PELT, Senior District Judge:

Petitioner seeks review of Opinion No. 64, Docket No. RP79–75 (Oct. 2, 1979) of the Federal Energy . Regulatory Commission (referred to herein as FERC or "the Commission"). Opinion No. 64 substantially approved Gas Research Institute's (GRI's) 1980 research and development (R & D) program, and the related 1980–84 five-year R & D plan, and allowed GRI's jurisdictional members to collect a general R & D funding unit of 4.8 mills per Mcf[1] in their rates for sales of natural gas. Petitioner's argument both before the Commission and this court is that FERC had no jurisdiction to approve the program of funding because:

1. GRI is not a natural gas company and does not engage in the transportation or sale of natural gas in interstate commerce, and therefore FERC has no jurisdiction over GRI; and

2. Even if FERC had jurisdiction over GRI, some of the R & D projects planned by GRI fall outside the jurisdiction of FERC and such costs cannot be imposed upon consumers of natural gas.

Before deciding these issues, it may be helpful to review briefly the functions and purpose of both FERC and GRI.

FERC came into being on October 1, 1977 pursuant to the provisions of the Department of Energy Organization Act of August 4, 1977, Pub.L.No.95–91, 91 Stat. 565 (codified at 42 U.S.C. § 7101 et seq.) and Executive Order No. 12009, 42 Fed.Reg. 46267 (Sept. 13, 1977). It assumed the functions and regulatory responsibilities of the Federal Power Commission (FPC) on that date. Under the Natural Gas Act, 15 U.S.C. § 717 et seq., FERC has the authority to regulate the interstate transportation and sale of natural gas by natural gas companies. See § 717(b).[2] A natural gas company is defined in § 717a as a person or corporation "engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."

The best brief description of GRI's membership and purpose appears in Opinion No. 64, which states: .

GRI was incorporated on July 8, 1976, under the General Illinois Not for Profit Corporation Act. GRI does not engage directly in research, development and demonstration activities. It is a planning

---

* Sitting by designation pursuant to 28 U.S.C. § 294(c) (1976).

1. One Mcf is 1,000 cubic feet. We are informed that, in terms of real economics, the average household consuming 125 Mcf during one year for space heating, cooling and water heating, will be assessed approximately 60 cents for R & D purposes.

2. Section 717(b) limits federal regulation to: the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

and managing organization which engages in such activities through RD&D project contracts with laboratories, universities and others. As of March 1979, GRI had 190 members—28 interstate pipeline members, 136 distribution company members, 24 municipal utility members, and two associate members.[3]

Prior to GRI's incorporation in 1976, the natural gas industry's research efforts were carried on collectively under the auspices of the American Gas Association (AGA) which is a trade association currently representing some 300 companies involved in the transportation and distribution of natural gas. AGA has filed a brief as an intervenor in this proceeding. Their brief indicates that AGA's first research project was undertaken in 1923 and such research has gradually been expanded through the years until by 1976 AGA had some 90 individual research projects divided into five major areas.[4] The research done by AGA was broad in scope, and this trend has been continued by its successor in interest, GRI.[5]

The first issue for our consideration is whether the Commission has any jurisdiction to approve GRI's research and development program and budget, not just the specific items contained within it. Petitioner contends that the Natural Gas Act does not confer any jurisdiction upon FERC to entertain or rule upon an application filed by a corporation which is not a natural gas company and does not sell or transport gas in interstate commerce. FERC has recognized that GRI is not a natural gas company within the meaning of § 717a(6). In opinion 11, which was an approval of GRI's first request for R & D advance approval in 1977, the Commission specifically stated:

GRI is not and does not propose to become a "natural gas company" within the meaning of Section 2(6) of the Natural Gas Act and, as a result, it is not and does not propose to become subject to our continuous jurisdiction.

The Commission went on to find, however, that because GRI was a R & D organization supported by the natural gas industry, it fell within the Commission's regulation of R & D organizations in 18 C.F.R. § 154.-38(d)(5) and its initial application fell within Sections 4, 8, 15 and 16 of the Natural Gas Act,[6] and that future annual applications would be submitted under the ratemaking authority granted to the Commission in Section 4 of the Act.

Section 4 of the Act, 15 U.S.C. § 717c, provides that all rates charged by a natural gas company must be "just and reasonable" and that every natural gas company must file schedules showing all rates and charges for any transportation and sale of natural gas. No change in any rates or charges can be made without first filing a copy of the proposed changes with FERC. The Commission then may hold a hearing on the lawfulness of the proposed rate. Under § 717d, the Commission has the authority to determine what constitutes a just and reasonable rate and to fix the same by order.

In this case GRI is proposing an increased assessment among its members of the costs of research and development. The 29 interstate pipeline companies belonging to GRI are natural gas companies subject to FERC's regulation. Before they can raise their rates to incorporate GRI's assessment,

---

3. Opinion No. 64, Docket No. RP79–75 at 4–5 (footnotes omitted). GRI's brief to this court indicates that it currently has 29 interstate pipeline companies as members, instead of 28 as stated above. The number is not relevant for the purposes of this opinion, although we will hereafter numerically refer to the group as consisting of 29 members.

4. The five major areas were (1) environmental protection, (2) home climate control and appliances, (3) large-scale commercial, industrial and on-site power uses, (4) supply distribution and storage operations, and (5) basic research.

5. GRI's five main research areas are (1) supply, (2) economics and systems analysis, (3) environment and safety, (4) efficient utilization, and (5) basic research. Specific projects within these areas will be explored later in this opinion.

6. The corresponding U.S.C. citations for Sections 4, 8, 15 and 16 of the Act are 15 U.S.C. §§ 717c, g, n and o.

they would need commission approval. Instead of requiring each company to submit an application for a rate increase, FERC has enacted 18 C.F.R. § 154.38(d)(5) which allows the R & D organization to submit the request for Commission approval. 18 C.F.R. § 154.38(d)(5)(ii) states in part:

> Where more than one jurisdictional company proposes to support an RD&D [7] organization as defined below, an approval request may be submitted to the Commission by the RD&D organization covering the organization's RD&D program as defined below. Approval by the Commission of such RD&D program shall constitute approval of individual companies' contributions to the RD&D organization. Organizations eligible to receive contributions from companies and to request program approval from the Commission under this section may be . . . RD&D organizations broadly supported by a single industry sector . . . .

Petitioner made no argument either before the Commission or this court with regard to Commission Rule 154.38(d)(5),[8] relying instead on the premise that

> if the FERC did not have jurisdiction under the substantive sections of the Natural Gas Act, then Section 154.38(d)(5)(i) through (v) cannot confer this jurisdiction.

Petitioner's brief at 26. Its sole argument is based on the fact GRI is not a natural gas company. We find such argument to be unduly restrictive and to exalt form over substance.

FERC does not seek to regulate that over which it has no statutory authority, but seeks to simplify the application procedures for those companies over which it does have jurisdiction. Instead of requiring each of the 29 interstate pipeline companies to apply for approval of R & D costs, FERC allows the R & D organization, which actually incurs the costs and plans the programs and budget, to submit a single application on their behalf. This seems to be the rare instance of a government agency trying to cut red tape, about which we all too often hear, only to be penalized for trying to streamline procedures.

It has been held on numerous occasions that the Federal Power Commission (FERC's predecessor) could exercise its ratemaking authority in a generic fashion as opposed to on a case-by-case basis. One of the issues in *Permian Basin Area Rate Cases*, 390 U.S. 747, 768, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968), was whether

> the Commission may, consistently with the Constitution and the Natural Gas Act, regulate producers' interstate sales by the prescription of maximum area rates, rather than by proceedings conducted on an individual producer basis.

The Supreme Court found that area regulation under the circumstances was permissible. The Court took note of the need for administrative ease with regard to the Commission's regulation of rates, stating:

> The Commission has asserted, and the history of producer regulation has confirmed, that the ultimate achievement of the Commission's regulatory purposes may easily depend upon the contrivance of more expeditious administrative methods. The Commission believes that the elements of such methods may be found in area proceedings. "[C]onsiderations of

---

**7.** RD&D stands for research, development and demonstration. Because Gas Research Institute's program contains only the first two areas, the reference is to R & D throughout this opinion.

**8.** FERC argues that petitioner's objections here constitute nothing more than a collateral attack on this regulation which was promulgated in 1977 in Order No. 566, Docket No. RM76–171, 13 FPS 5–542 (June 3, 1977). They contend that petitioner should have protested within 60 days of its promulgation, as provided for in the

Natural Gas Act. We find no merit in this contention. There has been a timely petition for review of Opinion 64, applying the earlier order, which is entirely proper. *See Geller v. F. C. C.*, 610 F.2d 973 (D.C.Cir.1979); *Alabama Ass'n of Insurance Agents v. Board of Governors of Federal Reserve System*, 533 F.2d 224 (5th Cir. 1976), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C.Cir.1958), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1959).

feasibility and practicality are certainly germane" to the issues before us. *Bowles v. Willingham*, [321 U.S. 503], 517 [64 S.Ct. 641, 648, 88 L.Ed. 892] [1944]. We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted.

*Id.*, 390 U.S. at 777, 88 S.Ct. at 1365. *See also Shell Oil Company v. Federal Power Commission*, 520 F.2d 1061 (5th Cir. 1975) which approved the FPC's promulgating a new rate order through rulemaking procedures and further sustained a new national rate for wellhead sales of natural gas, replacing the area rates earlier approved in *Permian Basin, supra.* In light of the above we find that the Commission had the authority to accept and rule on an application for a rate increase submitted by GRI on behalf of its jurisdictional members, and was not required to process applications on an individual basis.

The second issue raised by petitioner is that FERC approved GRI's expenditure of funds in 26 areas [9] of research which are outside the authority of GRI. Petitioner does not challenge on jurisdictional grounds any of the R & D project areas which have as their goal the production, transportation or sale of natural gas in interstate commerce. However, it claims the 26 areas, listed in footnote 9 herein,

> are *clearly* not within the purview of the Natural Gas Act or the jurisdiction of the FERC, and therefore not within the jurisdiction of the FERC to include as research and development projects, the cost of which is to be charged by interstate

pipeline companies to their customers, which ultimately is paid by the ultimate consumer . . . .

Docket No. RP79–75, Comments of the Public Utilities Commission of the State of Colorado Regarding the Application of Gas Research Institute at 7, Joint Appendix at 404. Those 26 areas, while not relating to the production, transportation, or sale of natural gas in interstate commerce, all have as their broad goal the conservation of dwindling gas supplies. This is to be accomplished in a variety of ways. Several research areas are geared toward helping the consumer household reduce its consumption of gas. Examples of this are gas-fired heat pumps, improved gas furnaces, improved gas appliances, and integrated appliances (i. e., using waste heat from gas range to preheat hot water, integrated furnace/water heater, etc.). Some areas of research are geared toward conservation of energy in the commercial sector, such as recovering low-grade excess heat from industrial processes, development of highly efficient, cost effective, generic classes of industrial heat recovery systems, and developing more efficient, less polluting multifuel industrial burner systems for direct and indirect combustion applications. Research is also proposed and budgeted to explore solar-augmented heating and cooling systems and water heaters, and solar-assisted appliances and gas heat pumps. Going beyond mere solar assisting of gas, is research into solar energy system components (such as storage development), research into thermochemical processes for large-scale production of hydrogen, the fea-

9. The 26 areas are as follows:

Thermochemical Hydrogen
Nonfossil Sources
Improved Utilization Technology Assessment
Control Technology Development
Gas-Fired Heat Pumps
Improved Gas Furnaces
Improved Gas Appliances
Advanced Appliance Technology
Integrated Appliances
Phosphoric Acid Systems
Advanced Fuel Cell Concepts
Field Test Activities
Heat Pump Developments

Energy Recovery Systems
Burner System Development
Process Efficiency Improvements
Residential/Commercial Applications
Industrial Solar-Augmented Systems
Solar Energy System Components
Kinetics and Catalysis
Thermodynamics [Synthetic Fuels portion]
Molecular Structure, Properties and Processes
Materials
Measurements and Instrumentation
Mass and Heat Transfer
University Grants.

sibility of using renewable energy sources to produce gaseous fuels, gas-fired, fuel cell electric power plants, fuel cell energy systems, and basic research into areas such as thermodynamics and molecular structure which would relate to synthetic fuels. In addition, there are seven other areas [10] to which petitioner objects relating to the production of artificial gas from sources such as coal, oil shale, land-based or water-based biomass. Petitioner argues that the Natural Gas Act gives FERC no jurisdiction over development and manufacture of improved gas appliances, furnaces, water heaters, electric power plants, solar energy, or synthetic fuels, and that these items are not intended to be and never will be purchased by a natural gas company and used in its jurisdictional business.

We find that the Supreme Court on numerous occasions has held that FERC, and its predecessor FPC, may take into consideration nonjurisdictional items when setting jurisdictional rates. In *FERC v. Pennzoil Producing Co.*, 439 U.S. 508, 99 S.Ct. 765, 58 L.Ed.2d 773 (1979) the Supreme Court held that the Natural Gas Act did not deny FERC the authority to give special rate relief to individual producers where escalating royalty costs were a function of, or were otherwise based upon, an unregulated market price for the product whose sale in the interstate market is regulated by the Commission. In *Panhandle Eastern Pipe Line Co. v. Federal Power Commission*, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241 (1945), the Supreme Court held that although the Commission lacked the authority to fix rates for direct industrial sales, it could take those rates into consideration when fixing the rates for interstate wholesale sales which were subject to its jurisdiction. Similarly, in *Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945), the Supreme Court held that while § 1(b) of the Natural Gas Act precludes the Commission from any control over the activity of producing or gathering natural gas,

it does not preclude the Commission from reflecting the production and gathering facilities of a natural gas company in the rate base and determining the expenses incident thereto for the purposes of determining the reasonableness of rates subject to its jurisdiction.

*Id.* at 603, 65 S.Ct. at 839. *See also Federal Power Commission v. United Gas Pipe Line Co.*, 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967) (FPC has the power to reduce rates based on the application of nonjurisdictional losses to jurisdictional income when it resulted in tax savings to the jurisdictional company). Thus, allowing a rate adjustment for some factor over which FERC does not have jurisdiction does not automatically mean the rate is unjust and unreasonable.

Petitioner has not cited any other case, controlling or otherwise, dealing specifically with research and development expenses under the Commission's ratemaking authority. It does claim a recent case in this Circuit, *Office of Consumers' Counsel v. Federal Energy Regulatory Commission*, 655 F.2d 1132 (D.C.Cir.1980) dealing with a demonstration project under the Commission's licensing authority is dispositive of this case. *Office of Consumers' Counsel*, hereinafter referred to as the *Great Plains* case, involved FERC's granting a certificate of public convenience and necessity to Great Plains Gasification Associates, composed of five affiliates of natural gas companies, to build a coal gasification plant. Although *Great Plains* and this case each deal, to some extent, with synthetic fuels, we believe the two cases should be distinguished.

In order to understand the differences, it will be necessary to examine the *Great Plains* case in some detail. The initial proposal was to build a commercial coal gasification plant at a cost of over one billion dollars which would produce 250,000 Mcf of synthetic gas. This was later scaled down

**10.** Those seven areas are:

Gasification Process
Associated SNG Technology
In-SITU Coal Gasification
Land-Based Crops
Water-Based Crops
Energy Conversion
Assessment and Field Studies.

to 125,000 Mcf. Unable to obtain federal loan guarantees, the project was revamped. Consumer ratepayers would shoulder the burden of critical financing costs, including guaranteeing the debt investment in the project under all circumstances. It was presented as a demonstration project to test the technical, environmental and economic viability of a coal gasification plant, and not designed as a project to supply gas.

A panel of this court found that the grant of the certificate was an attempt by FERC both to regulate and finance a synthetic fuel plant when the Natural Gas Act and case law such as *Henry v. FPC,* 513 F.2d 395 (D.C.Cir.1975), made it clear that FERC had no jurisdiction over synthetic fuel unless and until it was mixed with natural gas in interstate commerce. The panel found that the plant had "at best a tenuous relationship to any future jurisdictional sale or shipment of gas"[11] and that the financing arrangements "were certainly not ordered with the interests of ratepayers foremost in mind."[12] In finding that the Commission had exceeded its authority, the Court stated:

> Our own review ... of the purposes reasonably attributable to Congress in authorizing FERC's certifications and rate setting powers reveals that it did not intend to vest FERC with those powers for the purpose of regulating and arranging financing for facilities, like Great Plains, devoted exclusively to manufacturing synthetic gas. We therefore hold that Opinion 69 exceeded the Commission's statutory authority because it attempted to create a rate-payer-based financing package for the construction of a commercial-size coal gasification plant despite the fact that its rate setting and certificating powers were not granted to it for that purpose; and because it purported to regulate the construction and operation of such plant despite the fact that FERC has no regulatory jurisdiction over any aspect of synthetic gas development prior to its commingling with natural gas.

*Office of Consumers' Counsel, supra,* 655 F.2d at 1147–48.

Finally, even though this court found that the Commission did not have the authority to issue a certificate of public convenience and necessity pursuant to § 7 of the Natural Gas Act, 15 U.S.C. § 717f, it stated:

> Nothing in this holding denies FERC any authority it may have to consider the costs of production of synthetic gas in the course of considering jurisdictional sales rate filings and petitions under Section 4 of the Natural Gas Act, 15 U.S.C. § 717c, or to give advance notification that it will do so pursuant to its Order No. 566.

The differences between the *Great Plains* case and this one are readily apparent. Unlike *Great Plains,* and the *Henry* case before it, 513 F.2d 395 (D.C.Cir.1975), GRI does not here request from FERC certifications under Section 7 for its projects. On the contrary, only ratesetting for jurisdictional companies acknowledgedly within Section 4 jurisdiction is at issue here, and FERC's discretion and authority under the two sections are not necessarily coextensive. In this case FERC is not seeking to regulate the construction or operation of any project; in fact, GRI's research and development program does not include a single commercial demonstration project. Unlike *Great Plains,* also, where two FERC staff people were assigned full-time to Great Plains home office to oversee construction of the plant, GRI's research will be carried on without extensive supervision. GRI is not putting all of its eggs in one basket by devoting all of its resources to one risky venture, or to synthetic fuel (let alone one particular type of synthetic fuel), or to solar energy, etc. It has steered a course of moderation which includes areas of natural gas research, synthetic gas, gas efficiency, etc. If GRI's research results in gas saving appliances, or water heaters, or the ability to use solar-assisted appliances which would result in gas savings, it is clear that rate

---

11. *Office of Consumers' Counsel, supra,* at 1143.

12. *Office of Consumers' Counsel, supra,* at 1151.

paying customers would be benefited. Conservation is definitely a means of enhancing natural gas supplies and keeping consumer rates down.[13] We do not understand petitioner to have challenged such projects as not having any chance of success, or of not providing such potential benefit to consumers.

To limit research projects to the production or transportation of natural gas would not only be unduly restrictive, but would ignore the reality that natural gas supplies are being exhausted and are not renewable. In order to make natural gas available in the future, some sort of conservation must be exercised and the best alternatives studied and selected. The Supreme Court has stated that "[t]he fundamental purpose of the Natural Gas Act is to assure an adequate and reliable supply of gas at reasonable prices." *California v. Southland Royalty Co.*, 436 U.S. 519, 523, 98 S.Ct. 1955, 1958, 56 L.Ed.2d 505 (1978). Limiting research by GRI solely to areas of natural gas production would appear insufficient in assuring such an adequate and reliable supply at

reasonable prices. Finally, there is Supreme Court precedent[14] under Section 4 of the Act that FERC may take into account non-jurisdictional activities when setting just and reasonable rates.

This panel, which includes one member who was on the *Great Plains* panel, has concluded *Great Plains* is not controlling under the facts of this case. In summary, we believe there is a difference between FERC's becoming an active participant in the building, financing and operation of a large scale commercial synthetic fuel operation which had little possibility of benefit to the ratepayer, and the various areas of research to be carried out here.

The Commission's order is affirmed.

---

13. We earlier made reference in note 8, *supra*, to FERC's order No. 566, which permits the costs of various RD&D projects to be included in the rates of jurisdictional companies. *Office of Consumers' Counsel, supra*, at 1148–49 n.32. There we said that the Order

provides valid guidance in specifying under what circumstances advance assurance of rate treatment should be provided for RD&D projects brought before the Commission in Section 4 proceedings. Further, we recognize that despite the Commission's general practice of charging gas customers only for the costs of providing current service and deferring costs of investment for future service until that service begins, ... there may be situations where the Commission will have discretion to permit not only advance *assurance* of rate treatment, but also the charging to current ratepayers of expenditures incurred by a jurisdictional company on its RD&D experiment even before the experiment bears fruit, so long as FERC's jurisdiction to include the costs of the experiment does not depend solely on the contingency that the experiment bears fruit and contributes to the flow of mixed gas, as is the case with the Great Plains project. For example, expenditures for a RD&D project directly

concerning the transportation, transfer, or storage of natural or commingled gas, or related to increasing the supply of unmixed natural gas, might in appropriate circumstances be recoverable from current ratepayers, since such a project would be jurisdictional from its very inception. [Citations omitted.]

As we have noted, *supra* at p. 1137, all 26 R & D project areas in this case have as their broad goal the conservation of gas supplies, and we deem this to be within FERC's Section 4 authority to promote, since it results in increasing the supply of natural gas available to the nation's natural gas consumers. Taken as a whole, GRI's R & D program constitutes one of those situations where FERC may permit "the charging to current ratepayers of expenditures incurred by a jurisdictional company on [an] RD&D experiment even before the experiment bears fruit." *Office of Consumers' Counsel, supra*, at 1148–49 n.32.

14. *FERC v. Pennzoil Producing Co., supra; Panhandle Eastern Pipeline Co. v. Federal Power Commission, supra; Colorado Interstate Gas Co. v. Federal Power Commission, supra.*